**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**June 17, 2013**

# In the Court of Appeals of Georgia

A13A0103. KIRCHNER v. THE STATE.                              JE-004C

ELLINGTON, Chief Judge.

A Cherokee County jury convicted Debbie Kirchner of possession of more than one ounce of marijuana, OCGA § 16-13-30 (j) (1), (2) (a felony); possession of less than one ounce of marijuana, OCGA §§ 16-13-30 (j); 16-13-2 (b) (a misdemeanor); tampering with evidence, OCGA § 16-10-94 (a); and contributing to the delinquency of a minor, OCGA § 16-12-1 (b) (1). She appeals from the denial of her motion for new trial, contending that the evidence was insufficient to support her convictions. Because we find this contention to be without merit, we affirm.

When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). It is the function of the jury, not this Court, to determine the credibility of the witnesses, resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence. Id. "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citation and punctuation omitted.) *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001). Viewed in this light, the record reveals the following facts.

On the evening of August 4, 2007, a Cherokee County sheriff's deputy responded to a 911 call from Debbie Kirchner's next door neighbor, who had complained that some of Kirchner's visitors had illegally parked their cars in the cul-de-sac she and Kirchner lived on and that the cars were blocking her driveway. Upon arriving at the scene, the officer observed a Chevrolet Camaro parked in the middle of the cul-de-sac with its motor running and a passenger inside, as well as at least four other parked cars. Shortly thereafter, the officer saw two men walk out of Kirchner's home. One of the men immediately turned around and re-entered Kirchner's house after seeing the officer, but the other, 20-year-old Kevin Robins, walked toward the

2

idling Camaro. The officer saw that Robins was holding a paper bag tightly in front of him, and, while talking briefly with him, the officer smelled an odor of "real strong marijuana" coming from Robins and convinced him to open the bag and show what was inside. The bag contained a plastic baggy holding about eight ounces of marijuana. The officer placed Robins under arrest and called for backup assistance.

While the officer was waiting for assistance to arrive, Kirchner came outside and asked him what was going on. The officer told her that he was conducting an investigation about the drugs that he had discovered, and Kirchner said that Robins was her son's friend. Several minutes later, an agent with the Cherokee County Multi-Agency Narcotics Squad and another police officer arrived, and the agent interviewed Robins, who said that he had bought the marijuana from Kirchner's 15-year-old son, D. K., who was still inside the house. The agent then asked Kirchner for her consent to search her house, but Kirchner refused, so the agent told the officers to get everyone out of the house while he obtained a search warrant.[1] The officers called into the house and told everyone to come outside. Ultimately, the two officers detained nine individuals (including Kirchner, D. K., Robins, and Robins' passenger)

___

[1] Kirchner does not challenge the legality of the search on appeal.

in the cul-de-sac to await the return of the agent and the execution of the search warrant.

While waiting, Kirchner repeatedly insisted that she needed to use the bathroom "real bad," but the officers did not allow her to go back into the house initially because one of them would have to accompany her inside and there were only two officers on site with eight other people to watch. The officers explained that, out of concern for their safety, one of them could not be left alone to watch over that many detainees while the other accompanied Kirchner into the house. Kirchner persisted with her complaint, however, so the officers eventually relented and allowed her to go alone into the house solely to use the bathroom, telling her to come back outside as soon as she was finished. After Kirchner was alone in the house for ten to fifteen minutes, one of the officers went to the door and ordered her to come outside, at which time he saw Kirchner running from one side of the house to the other, toward the kitchen. He heard the sound of dishes being moved around, and then Kirchner came outside. She was panting and out of breath, and she asked the officer if she could sit down to rest.

About an hour after leaving, the agent returned with a search warrant, and he and the officers went inside to execute the warrant; they had the nine detained

4

individuals wait in the living room in the upper portion of the split level house. Both the agent and one of the officers testified that, as soon as they entered the house, they smelled a strong odor that they immediately recognized as marijuana. While searching the upper level of the house, they discovered a plastic baggy containing less than an ounce of marijuana and a pipe containing marijuana residue in a drawer in Kirchner's bedroom. In the kitchen, the officers observed that the dishwasher had just stopped running and was still steaming. Inside the dishwasher, the officers discovered several baggies that had been washed. The agent testified that some of the baggies contained a substance that, based upon his extensive training and experience in narcotics law enforcement, appeared to be marijuana residue. According to the agent, he did not collect the baggies as evidence to be tested by the crime lab because he knew that, when marijuana gets wet, it develops a toxic mold that is very harmful to humans if inhaled.

In the lower level of the home, the officers found a family room area with an attached bedroom belonging to D. K. The bedroom door was locked, but the officers obtained the key from D. K. Inside the bedroom was a large, locked gun safe that was approximately five feet tall and two to three feet wide and that, according to the agent's estimation, would have cost between $2,000 and $3,000. The officers brought

Kirchner and her son downstairs and asked them for the combination to the lock. After D. K. hesitated, Kirchner told him to unlock the safe, and he complied. Inside the safe, the officers found a 12-gauge shotgun, several plastic baggies containing a total of about 13 ounces of marijuana, bongs and pipes typically used to smoke marijuana, several empty plastic baggies, two scales, two marijuana grinders that are used to remove seeds and stems, and a jar of marijuana seeds from which to grow marijuana plants. According to the agent, Kirchner had no visible reaction or change in her demeanor when she saw what was inside the safe. In addition to the evidence found in the safe, the officers found an issue of *High Times* magazine, a leaf from a marijuana plant, and a cell phone belonging to D. K. in the bedroom; the cell phone contained pictures of marijuana. The officers also discovered a closet that contained a "grow lamp" that is typically used to grow marijuana and an overturned pot that contained a small amount of damp potting soil. The officers arrested Kirchner and D. K. for, inter alia, possession of marijuana; D. K. was prosecuted as a juvenile.

At Kirchner's trial, the State called three of the young men who were at her house when the first officer arrived on the day at issue. Kevin Robins, who was arrested after he left Kirchner's house with a half pound of marijuana, testified that he had been going to the Kirchner's house to "hang out" and smoke marijuana with

6

D. K. three or four times per week since the Kirchner family moved into the house, usually staying for three or four hours at a time. He had started buying marijuana from D. K. a few months before his arrest. According to Robins, during his visits, there were usually several young people smoking marijuana in the downstairs family room, using the pipes, bongs, and other paraphernalia that the officers found in the safe, and other people sometimes stopped by the house just to buy marijuana from D. K. Robins testified that D. K. had told him that he was growing marijuana. Following his arrest, Robins pled guilty to felony possession of marijuana with intent to distribute. Significantly, during Robins' guilty plea hearing, when asked if Kirchner would have known that he was smoking marijuana downstairs in her home, Robins responded that it would have been hard for her not to know about it because of the odor of marijuana that was usually present.

Another of the young men, Michael Tyler Lebeouf, who was 18 years old on the day at issue, testified that he went to Kirchner's house a few times a week to "hang out" with D. K. and their friends and to smoke marijuana in the downstairs family room. According to Lebeouf, there was normally marijuana and smoking paraphernalia, including the bongs and other items later discovered in the safe, sitting around in plain sight and being used in the family room, and there was usually an

odor of marijuana in the house. He testified that, based on the large amounts of money and marijuana that D. K. had, he believed that D. K. sold "a lot" of marijuana. He also testified that the marijuana seeds found in the safe belonged to D. K. Lebeouf pled guilty to misdemeanor possession of marijuana, and, during his guilty plea hearing, he testified that Kirchner occasionally came into the downstairs family room while he was there with D. K. and other visitors.

The testimony of Tyler Smith, who was about 18 years old on the day at issue, was consistent with that of Lebeouf regarding the typical atmosphere in Kirchner's downstairs family room, including the numerous visitors; the marijuana and smoking paraphernalia sitting in plain sight; the open, almost constant smoking of marijuana; D. K.'s regular sales of marijuana to his friends and others; and the pervasive odor of marijuana that resulted from "a pretty good amount of smoking that happened" down there. Smith, who pled guilty to misdemeanor marijuana possession following his arrest that day, testified that D. K. had told him that he was growing marijuana. Smith also testified that Kirchner sometimes came into the downstairs family room to talk to D. K. while people were openly smoking marijuana down there.

Unlike Robins and Lebeouf, however, Smith was actually *in the downstairs family room* with D. K. and several others when the first officer arrived in the cul-de-

8

sac on the day at issue and, thus, was able to describe what happened before the officers cleared everyone from the house. According to Smith, he and the others were smoking marijuana when one of them looked out the window, saw the officer arresting Robins, and alerted the others. D. K. first appeared to be "shocked," then he gathered up all of the marijuana and paraphernalia from the family room, went into his bedroom, closed the door, and stayed there for a few minutes before going outside to join his mother and the others.

In addition to this evidence, Kirchner's neighbor testified that, since the Kirchner family moved next door, there had been a significant, ongoing problem with traffic in the cul-de-sac, usually in the evenings and on the weekends, due to the large volume of people who parked, went into Kirchner's home for a few minutes, then left, often followed by others who did the same thing. According to the neighbor, she sometimes smelled marijuana when she sat outside her home, and she saw people standing on Kirchner's back porch and smoking. She also saw D. K. and another person carrying plants that appeared to be marijuana out of Kirchner's house and onto the back porch. The neighbor also testified that, about three months after the day of the search and arrests at issue here, her husband was standing outside when Kirchner and her family approached and started yelling at him. The neighbor went outside to

9

intervene, telling Kirchner to go inside, "do your drugs, mellow out," and leave them alone. Kirchner responded, "Well, maybe if you'd come down here and do some of our drugs[,] you'd mellow out."

Kirchner did not testify at trial, nor did she call any witnesses in her defense, which was based upon the assertion that all of the marijuana found in the safe or elsewhere downstairs belonged exclusively to her son and that she had no control over the drugs or any knowledge about the drug sales or other activities occurring downstairs.

1. On appeal, Kirchner contends that there was insufficient evidence to support her conviction for felony possession of greater than one ounce of marijuana; the conviction was based on the 13 ounces of marijuana found in her son's locked gun safe. Specifically, Kirchner argues that the State failed to present sufficient evidence to show that she had exercised dominion and control over those drugs. She argues that, instead, the evidence proved that her son, D. K., had exclusive access to the contents of the safe. For the following reasons, we disagree.

> In Georgia, it is unlawful for any person to possess any controlled substance, and possession of controlled substances may be actual or constructive. Although not in actual possession, a person who knowingly has both the power and the intention at a given time to

10

exercise dominion or control over a thing is then in constructive possession of it. To prove constructive possession, the State must establish a link between the defendant and the contraband that goes beyond mere spatial proximity.

(Citations and punctuation omitted.) *Smoot v. State*, 316 Ga. App. 102, 113 (6) (729 SE2d 416) (2012).

(a) First, pretermitting whether D. K. was the only person who knew the combination to the gun safe (a contention asserted by Kirchner but unsupported by evidence), there was still sufficient evidence to support a finding that she was a party to her son's illegal possession of the felony amount of marijuana found inside the safe. Under OCGA § 16-2-20 (a), "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." A person is "concerned in the commission of a crime" under this statute if he or she "[i]ntentionally aids or abets in the commission of the crime[.]" OCGA § 16-2-20 (b) (3). If the defendant is not the actual perpetrator of the crime, his or her mere presence at the scene of the crime is not sufficient evidence to establish that he or she was a party to the crime. *Pruitt v. State*, 282 Ga. 30, 32 (1) (644 SE2d 837) (2007). Instead, the State must show that the defendant shared a common criminal intent with

11

the actual perpetrator, a fact which the jury may infer from evidence of the defendant's conduct before, during, and after the crimes. Id.

Here, the evidence showed that, on the day at issue, Kirchner's son, D. K., was a 15-year-old high school dropout who was working part-time as a busboy at a bar. According to the unrebutted testimony of his friends, D. K. spent most of his time in the downstairs family room of his mother's house, smoking marijuana and selling it to a regular stream of customers whose cars routinely cluttered the cul-de-sac. To safeguard the contraband, D. K. used a very large gun safe that probably cost between two and three thousand dollars. Further, according to the narcotics agent, when the officers opened the safe and exposed the marijuana, paraphernalia, and shotgun stored therein, Kirchner did not appear to be surprised and, in fact, demonstrated no change in her demeanor at this discovery. In addition, the evidence supported an inference that Kirchner convinced the officers to violate their official protocol and let her enter her house, under the pretense of desperately needing to use the bathroom, so that she could destroy material evidence by gathering several baggies of marijuana and washing them in the dishwasher.[2] Finally, Kirchner's neighbor testified that, during

---

[2] See Division 3, infra, regarding the tampering with evidence conviction.

a confrontation, Kirchner specifically referred to the drugs in her home as "our drugs."

This evidence was clearly sufficient for the jury to find that Kirchner knowingly allowed her son to possess felony amounts of marijuana in her home and, in fact, assisted him in that ongoing, shared criminal enterprise by, inter alia, purchasing a safe to store and conceal the marijuana, related paraphernalia, and a firearm. As a result, the jury was authorized to conclude that Kirchner was a party to the crime of felony possession of marijuana beyond a reasonable doubt. OCGA § 16-2-20 (a), (b) (3).

(b) Second, regardless of the merits of Kirchner's contention that she had no *actual* knowledge of her son's illegal activities, the evidence still supports a finding that she deliberately ignored the multiple, blatant signs of such activities and, thus, is deemed to have the requisite knowledge to support her conviction.

> This Court has repeatedly recognized that the knowledge element of a violation of a criminal statute can be proved by demonstrating either actual knowledge or deliberate ignorance of criminal activity. The deliberate ignorance instruction is based on the alternative to the actual knowledge requirement at common law that if a party has his suspicions aroused but then deliberately omits to make further inquiries, because he wishes to remain in ignorance, he is deemed to have knowledge. A

13

deliberate ignorance instruction is appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.

(Citations and punctuation omitted.) *Able v. State*, 312 Ga. App. 252, 258 (3) (718 SE2d 96) (2011). See also *Aguilera v. State*, 293 Ga. App. 523, 525 (1) (667 SE2d 378) (2008) (accord).

Here, given the evidence showing, inter alia, the open and pervasive use of substantial amounts of marijuana in the downstairs family room, the odor resulting therefrom, and the number and frequency of visitors to the house, the jury was authorized to find that, if Kirchner lacked actual knowledge of the illegal marijuana possession and use in her home, it was only because she deliberately ignored the blatant evidence of such activities. *Able v. State*, 312 Ga. App. at 259-260 (3) (a).

(c) Third, the undisputed fact that Kirchner was the owner and a full-time resident of the house wherein the marijuana was discovered created a rebuttable presumption that she had control over the marijuana found inside.

Under Georgia law, a presumption of possession and control arises when the defendant owns or resides in the premises. *Smoot v. State*, 316 Ga. App. at 113 (6);

14

*Clewis v. State*, 293 Ga. App. 412, 414 (2) (667 SE2d 158) (2008). Further, "the equal access rule does not apply to eliminate the presumption of possession where all persons allegedly having equal access to the contraband are alleged to have been in joint constructive possession of the contraband." (Citations and punctuation omitted.) *Smoot v. State*, 316 Ga. App. at 114 (6). See also *Clewis v. State*, 293 Ga. App. at 415 (2) ("[T]he equal access doctrine applies to rebut the presumption of possession only where the *sole* evidence of possession of contraband found on the premises is the defendant's ownership or possession of the premises.") (citation omitted; emphasis in original). Ultimately, as "long as there is slight evidence of [the defendant's] access, power, and intention to exercise dominion or control over the contraband, the question of fact as to constructive possession remains with the jury." (Citations and punctuation omitted.) *Smoot v. State*, 316 Ga. App. at 113 (6).

Here, the State established the presumption that Kirchner, as the house's owner and resident, had control of the marijuana found inside, including that in the gun safe, and she was not entitled to rely on the equal access rule to rebut that presumption. *Smoot v. State*, 316 Ga. App. at 113-114 (6). This presumption, considered with the other inculpatory evidence outlined above, authorized the jury to find that Kirchner

15

knowingly had constructive possession of the marijuana found in the gun safe and, thus, was guilty beyond a reasonable doubt of felony possession of marijuana. Id.[3]

2. Kirchner contends that there was insufficient evidence to support her conviction for contributing to the delinquency of a minor, arguing that the conviction was dependent upon a finding that she knowingly aided him in possessing the marijuana found in the gun safe.[4] According to Kirchner, because there was insufficient evidence to support her conviction for felony possession, the same is true

---

[3] Cf. *Cobarrubias-Garcia v. State*, 316 Ga. App. 787, 789-791 (730 SE2d 455) (2012) (physical precedent only) (The State failed to prove that the defendant knowingly possessed the drugs because he was not the owner or lessee of the house; no contraband was found on his person; and the evidence did not link him with the drugs found hidden in the house. Consequently, this Court reversed his drug trafficking conviction.); *Aquino v. State*, 308 Ga. App. 163 (706 SE2d 746) (2011) (The State failed to prove that the defendant knowingly possessed the drugs because he was not the owner or lessee of the house; no contraband was found on his person; and the evidence did not link him with the drugs or manufacturing equipment found in the house. Consequently, this Court reversed his drug trafficking conviction.).

[4] The indictment charged Kirchner with "knowingly and willfully aid[ing] [D. K.], a minor, in committing a delinquent act, to wit: possession of marijuana, a delinquent act as set forth in OCGA § 15-11-2[.]" See OCGA §§ 15-11-2 (6) (The term "delinquent act" includes "[a]n act designated a crime by the laws of this state, under federal laws, or by local ordinance," but it does not include acts that are described under the "unruly child" provision of this Code section or juvenile traffic offenses.); 16-12-1 (b) (1) ("A person commits the offense of contributing to the delinquency, unruliness, or deprivation of a minor when such person . . . [k]nowingly and willfully encourages, causes, abets, connives, or aids a minor in committing a delinquent act[.]").

16

for this conviction. Given our ruling in Division 1, supra, this argument must likewise fail.

3. Kirchner also contends that the evidence presented was insufficient to support her conviction for tampering with evidence. The indictment charged Kirchner with "knowingly conceal[ing] and destroy[ing] physical evidence of marijuana manufacturing and possession of greater than one ounce of marijuana" with the intent to obstruct the prosecution of her son.

(a) Kirchner argues that the State failed to have the residue in the baggies that were discovered in the dishwasher tested to determine if it was, in fact, marijuana residue. She argues that, as a result, the circumstantial evidence presented by the State failed to exclude the reasonable hypothesis that the residue in the baggies was actually herbs, spinach, or another legal substance.

Under former OCGA § 24-4-6, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."[5]

---

[5] In 2011, the Georgia General Assembly repealed the existing Evidence Code in its entirety and replaced it with a new Evidence Code, the provisions of which became effective on January 1, 2013, and apply to any motion, hearing or trial

17

> In order to support a conviction, such circumstantial evidence does not have to exclude *every* possible hypothesis other than the defendant's guilt, but only *reasonable* hypotheses. Whether a hypothesis is reasonable is a question for the jury, and such finding will not be disturbed on appeal unless the guilty verdict is insupportable as a matter of law.

(Citations omitted; emphasis in original.) *Eberhart v. State*, 241 Ga. App. 164, 165 (1) (526 SE2d 361) (1999).

(i) First, the record shows that Kirchner did not argue this alternative explanation of the contents of the baggies to the jury during closing arguments. Instead, she argued that it must have been someone else who collected the baggies of marijuana and put them in the dishwasher in order to destroy the evidence, such as the young people who were in the house between the time Robins was arrested in the cul-de-sac and when the officers ordered everyone to come out of the house. The jurors clearly rejected that alternative explanation as to who actually put the baggies in the dishwasher, as they were authorized to do, and Kirchner has abandoned it on appeal.

---

commenced on or after such date. Ga. L. 2011, p. 99, §§ 1, 101. Pursuant to that legislative act, former OCGA § 24-4-6 has been reenacted as OCGA § 24-14-6.

(ii) Second, by washing the baggies in the dishwasher, Kirchner destroyed virtually all of whatever substance was inside, leaving only a residue that the agent believed to be marijuana, based on his training and experience, but that he did not retrieve and submit for drug testing based upon his belief that to do so would create the risk of seriously injuring anyone who inhaled fumes from the residue.[6] Thus, the record supports a finding that it was only as a direct consequence of Kirchner's intentional act of washing the baggies in the dishwasher that the State was unable to safely test the substance and, instead, was forced to rely on circumstantial evidence to prove that the substance originally in the baggies was marijuana and not some innocuous foodstuff.

To that end, the State showed the jurors pictures of the baggies found in the dishwasher, which they were able to compare to baggies found in the gun safe that indisputably contained marijuana, as well as the baggies in the paper bag Robins was carrying as he left Kirchner's home and the numerous empty baggies recovered from the safe. This evidence, when considered with the evidence of the marijuana and drug

---

[6] Although Kirchner filed a motion in limine to exclude the agent's testimony about the nature of the residue in the baggies found in the dishwasher, she has not challenged the court's admission of the testimony on appeal. Instead, she contends that the testimony, standing alone, was insufficient to prove that the residue was, in fact, marijuana.

paraphernalia found in the home, the agent's opinion about the nature of the residue, and Kirchner's decision to destroy the contents of the baggies when she knew that a search of her home was imminent, was sufficient for the jury to find that the only reasonable hypothesis was that the baggies found in the dishwasher contained marijuana when Kirchner put them in the dishwasher and that she did so with the intent to destroy material evidence. See *Rosser v. State*, 284 Ga. 335, 335-336 (1) (667 SE2d 62) (2008) (In a case involving a murder during a drug sale, the State proved that the drug was marijuana by presenting circumstantial evidence of the defendant's purchase and use of the substance and by showing that there were "marijuana-like substances" scattered throughout the victim's car, including the trunk, a sample of which was tested and found to be marijuana.); *Jones v. State*, 268 Ga. App. 246, 249 (1) (601 SE2d 763) (2004) (Police officers' opinions that a substance was marijuana, combined with circumstantial evidence that, inter alia, the defendant acted as if the substance was marijuana, constituted sufficient evidence to support the jury's conclusion that the defendant possessed marijuana, even absent conclusive scientific testing of the substance.);[7] see also *Phillips v. State*, 242 Ga.

---

[7] Cf. *King v. State*, 317 Ga. App. 834, 838-841 (2) (c) (733 SE2d 21) (2012) (During a traffic stop, officers wrestled the defendant to the ground and restrained her, at which time they observed a small amount of green leafy substance in her

20

App. 404, 404-405 (530 SE2d 1) (2000) (The jury could infer that the defendant, who was the only person in the kitchen at the time of the execution of the search warrant, intended to destroy evidence of cocaine in her home by placing the plastic bag in which it was contained in the garbage disposal and turning it on.).

(b) In the alternative, Kirchner argues that her tampering conviction must fail because there was a fatal variance between the crime charged in the indictment and the evidence presented at trial. As noted above, the indictment charged that Kirchner tampered with evidence with the intent to obstruct the *prosecution of her son*. On appeal, she argues that the evidence showed that she destroyed the baggies of marijuana by washing them in the dishwasher in an attempt to prevent *her own prosecution*, a crime for which she was not indicted.

---

mouth. The defendant denied that she had consumed any marijuana, and the officers did not observe her place anything in her mouth. The officers testified that, based upon their training and experience, the leafy substance was consistent with green marijuana, but they did not retrieve any of the substance because they feared being bitten. The officers subsequently searched the defendant and her car, but found no illegal substances or drug paraphernalia. This Court concluded that, under these circumstances, the evidence was insufficient to exclude all reasonable hypotheses except that the defendant had ingested marijuana with the intent to prevent her apprehension or prosecution.); *Chambers v. State*, 260 Ga. App. 48, 50-52 (1) (579 SE2d 71) (2003) (Because the only evidence presented to show that a substance was marijuana was the opinion testimony of police officers and the introduction of the substance at trial, the evidence was insufficient to exclude the reasonable possibility that the substance was something other than marijuana.).

We find that this argument lacks merit for many of the same reasons discussed above, as well as the fact that, during closing arguments, her attorney argued that she had no knowledge of the marijuana and illegal activity and *was trying to protect her son* when she refused to consent to the search of her home. In addition, her trial attorney specifically admitted during the new trial hearing that Kirchner's sole defense at trial was that the marijuana found in her house belonged exclusively to her son, that she had no knowledge of it, and that *she was trying to protect her son* when she refused to consent to the search.

Most importantly, however, Kirchner waived our consideration of this fatal variance argument by failing to raise it and obtain a ruling on it in the court below. See *Weeks v. State*, 316 Ga. App. 448, 450 (1) (729 SE2d 570) (2012) (The defendant's failure to raise the fatal variance issue in the trial court waived the issue for consideration on appeal.); see also *Williams v. State*, 277 Ga. App. 106, 108 (2) (625 SE2d 509) (2005) ("We are a court for the correction of errors of law committed by the trial court where proper exception is taken, and we will not consider issues and grounds for objection, even of a constitutional magnitude, which were not raised and determined in the trial court.") (footnote omitted).

*Judgment affirmed. Phipps, P. J., and Branch, J., concur.*