**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 1, 2019**

# In the Court of Appeals of Georgia

A18A1872. WHITELOCK v. THE STATE.

REESE, Judge.

A jury found Gebre Whitelock guilty of aggravated child molestation, child molestation, and cruelty to children in the first degree[1] based on acts committed against his step-daughter (hereinafter, "the victim"). The Appellant appeals from the trial court's denial of his motion for new trial, arguing that he received ineffective assistance of counsel, that the trial court erred in excluding evidence, and that his sentence is void. For the reasons set forth, infra, we affirm the Appellant's convictions and the sentences on his aggravated child molestation and cruelty to children convictions, but we vacate his sentence on his child molestation conviction and remand this case for resentencing.

---

[1] See OCGA §§ 16-6-4 (c); 16-6-2 (a) (1); 16-6-4 (a) (1); 16-5-70 (b).

Viewed in the light most favorable to the jury's verdict,[2] the evidence showed the following facts. In October 2009, the Appellant lived with his wife (hereinafter, "mother"), his wife's eight-year-old daughter ("victim"), the couple's two young children, and his wife's mother ("grandmother"). According to the victim, after her mother had fallen asleep one night, the Appellant went into the victim's bedroom, made her get out of bed, and told her to put her mouth on his penis. The Appellant told her that, if she did not do it or if she told anyone, "something bad [would] happen[,]" and he threatened to kill her mother. The victim believed the Appellant and was scared, so she complied with his demand. The victim testified that, in the months that followed this incident, the Appellant repeatedly made her perform oral sex on him, performed oral sex on her, and touched her genitals with his hand. Because the victim continued to believe that the Appellant would kill her mother, she did not tell anyone about the molestation.

The victim also testified that the Appellant frequently "punish[ed]" her "for no reason" by making her stay alone in her bedroom. In addition, the Appellant sometimes showed the victim "nasty videos" on the computer in his and his wife's bedroom ("parents' bedroom"); in the videos, "[g]irls were putting their mouth on

---

[2] See *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004).

boys' private area[s]." According to the victim, the Appellant told her to watch the videos because "he wanted [her] to be a professional[,]" but she did not understand what he meant. The victim testified that, whenever he molested her, the Appellant had been drinking.

During this same time period, the victim's grandmother started noticing that the Appellant was picking up the victim and hugging her more than the grandmother thought was normal or acceptable. The grandmother also observed, however, that the Appellant was "always punish[ing]" the victim by locking her in her bedroom or the parents' bedroom for the entire day, and the Appellant was often alone with the victim in the bedroom with the door locked. According to the grandmother, one time when she went into the bedroom to check on the victim, the victim looked "scared." The grandmother did not understand why the Appellant punished the victim so much because she was a "pretty good little girl" and a "straight A student" who was in the gifted and talented program at school. The grandmother became more confused and concerned when she noticed that the Appellant was taking the victim into the parents' bedroom at night, while the mother was sleeping, because the grandmother knew of no reason for him to do so. Finally, the grandmother's concern was heightened when

the victim started walking around the house in the morning with only her underpants on while the Appellant was home.

Based on these observations, the grandmother repeatedly told the mother that she suspected the Appellant was "messing" with the victim, and she urged the mother to "check it out" because "something's going on." The mother admitted at trial that she was in "denial" when the grandmother first talked to her about it. On the morning of August 30, 2010, however, while the family was in the car on the way to the victim's school, the mother whispered to the victim and asked if "anybody [had] been bothering her." According to the mother, the victim became "fearful" and began "shaking and . . . trembling." The victim then nodded and pointed at the Appellant. The mother and the victim got out of the car, and the mother confronted the Appellant, asking if he had been "messing" with the victim. The Appellant started to cry and denied doing anything to the victim, but then got out of the car and "started ranting around." He told the victim that he was "so sorry that I did this to you[,]" and asked his wife for help because he had a "problem." The Appellant told the victim that he "wasn't going to do it anymore[,]" and asked her, "why are you doing this to me?" The mother threw the Appellant's belongings out of the car, drove off without him, and went to the victim's school, where she spoke to the school's social worker.

4

After getting some basic information from the mother about the allegations, the social worker called the Department of Family and Children's Services ("DFCS") and reported the sexual abuse.[3] The mother then took the victim to the hospital, where a certified pediatric nurse practitioner performed a sexual assault examination on the victim. A forensic interview was subsequently conducted,[4] and, based on what the victim reported during the interview, a police detective obtained an arrest warrant for the Appellant.

Law enforcement officers were initially unable to locate the Appellant, though, because the Appellant took a bus to North Carolina on August 30, 2010, a few hours after the mother confronted him about the victim's allegations. Officers eventually located the Appellant in North Carolina, placed him under arrest, and brought him back to Georgia to face the instant charges.

At trial, the mother testified that the Appellant had started "drinking a lot" in the six months that preceded the victim's disclosure. She testified that, when the Appellant was drinking, he was "a little more apt to want to have sex[,]" and "would

---

[3] No DFCS witness was called to testify at trial, nor were any DFCS records tendered, authenticated, or admitted at trial.

[4] A video recording of the forensic interview was played for the jury at trial.

5

become kind of uncontrollable. He would basically change character. . . . He [would become] very wild, mean, argumentative, very verbally abusive." According to the mother, the Appellant threatened to kill her if she ever called the police on him, warning her that he knew her whole family and where they lived. The grandmother also testified that the Appellant had started becoming intoxicated "more and more every day" and became "real angry" when he did so. She testified that the Appellant was abusive to the mother and the children, and that the mother was afraid of him.

In addition, the mother testified that, in 2009, she discovered a child sex video on the Appellant's computer in their bedroom. She asked the Appellant about it, and he said it was the result of a computer virus. The mother later noticed that the computer's memory had been deleted. After the victim disclosed her sexual abuse, the mother took the computer to the Appellant's sister's house to be stored, but, when a detective went to the house to retrieve it, the detective was told that the computer was not there, and it was never recovered. At trial, the Appellant admitted that there was a computer in the bedroom he shared with his wife and that he had majored in computer technology in college.[5]

---

[5] Notably, when the prosecutor asked the Appellant what he had studied in college, he initially stated that he "want[ed] to plead the Fifth[,]" but answered after he was reminded that he waived that right when he took the stand at trial.

Finally, according to the mother, from October 2009 to August 2010, the victim became "very distant and depressed[,]" which was different from her normal demeanor, and she started "wetting the bed" almost every night. The victim admitted that she "peed" in her bed every night while she was being molested, but she testified that she no longer did so at the time of the trial "[b]ecause nobody is bothering me." The grandmother testified that, once the Appellant was no longer around the victim, the victim was "not afraid anymore. [She does not] have to be punished. [S]he's free now. It's like . . . she was a slave, enslaved. [S]he wasn't herself. [S]he wet on herself. She just wasn't herself."

In addition to these witnesses, the State presented the testimony of the school social worker, the nurse who performed the sexual assault examination, the police detective who initiated the investigation, the counselor who conducted the forensic interview, and Anique Whitmore, the Fulton County District Attorney's Director of Forensic Services.[6] Whitmore testified that, as part of her work in the "crimes against

[6] Before Whitmore testified, the Appellant's trial counsel objected to her offering any opinion or fact testimony, arguing that she was not an expert qualified to offer an opinion, she was biased toward the prosecution, her testimony would improperly bolster the victim's testimony, and her testimony would be speculative and irrelevant. The trial court overruled the objection, but granted counsel a continuing objection to Whitmore's testimony. The Appellant has not raised the court's admission of Whitmore's testimony as an alleged error on appeal.

women and children" unit, she worked with a team to evaluate cases when the victim of an alleged crime was a child. In doing so, she worked with alleged victims

> to assess their recall, their memory, their ability to testify. . . . [W]e assess [the case] as a team and look at a case and look at the details and the investigation to see the details of what is in front of us to make the best decision [about] going forward. . . . I am part of the unindicted team as well, I work with cases that have not been indicted. And so[,] in review of those cases, looking at the forensic interview, meeting with the victim, speaking with perhaps investigators on the case, and if there are reasons using my expertise in forensic and child development, if there's holes in it . . .

Trial counsel interrupted and objected "to this line of questioning and answers[,]" the court sustained the objection, and the prosecutor moved on, asking Whitmore about her other education and experience. The prosecutor then proffered Whitmore as an expert in forensic interviewing and child sexual abuse evaluation and treatment.[7] During her testimony, Whitmore discussed "child sexual abuse accommodation syndrome" and described the different stages a child victim might go through following molestation, including "secrecy, . . . helplessness, entrapment, delayed disclosure, and recantation." Whitmore emphasized that, while these stages were

---

[7] Trial counsel stated that she would "stand on [her earlier] objection," and the court admitted Whitmore as an expert over that objection.

consistent with sexual abuse, the fact that a child was acting in a manner consistent with one or more of the stages did not prove that the child had, in fact, been sexually abused. Whitmore also described other symptoms or behaviors that a child might experience as part of the syndrome, such as declining grades, "twitch[ing]" or scratching, exhibiting outbursts or discipline issues, and/or developing eating or sleeping disorders, including urinating in bed. In addition, Whitmore testified about "coaching," when someone tells a child what to say to a forensic interviewer or other investigator. According to Whitmore, when evaluating forensic interviews, she looks

> for the lack of contextual detail. Contextual details are who, what, where, why, when, what things smelled like, tasted like, looked like, what was said, what happened before, what happened after. If the victim is unable to give me most of these details, a red flag goes up in my mind as to [whether] this child really experience[d] it or did somebody tell them what to say."

Although Whitmore testified that she had watched the recording of the forensic interview of the victim in this case, she did not testify as to whether, in her opinion, the behaviors exhibited by the victim were consistent with child sexual abuse accommodation syndrome. More importantly, Whitmore did not offer any opinion

9

about the credibility of the victim in this case or otherwise suggest that the victim had, in fact, been molested by the Appellant.[8]

After the State rested its case, the Appellant testified in his defense, and he presented the testimony of his former girlfriend, who had been a good friend of the mother, in an attempt to attack the credibility of the mother and grandmother. The defense theory was that the victim's allegations were not based on any actual molestation by the Appellant, but, instead, were fabricated by the victim and her mother or were based on the frequent inappropriate, sexually-graphic conversations between the mother and the grandmother that the victim had overheard.[9] In addition, the defense contended that the grandmother was mentally ill and that her alleged observations of the interactions between the Appellant and the victim were, instead, illusions that resulted from her mental illness.[10] According to the defense theory, as a result of the mental illness, the grandmother repeatedly accused the Appellant of molesting the victim and, because the victim was present when the accusations were

---

[8] See Division 3, infra.

[9] During the State's case, the mother and grandmother both denied that they ever spoke of molestation or sex in general in front of the victim or the other children.

[10] See Division 1, infra.

10

made, the victim began to believe that she had, in fact, been molested. To support this defense, the Appellant testified that the grandmother sometimes walked outside and screamed while drunk and naked, "always flip[ped] out," and/or reported events to the apartment's rental office that had not happened, and he characterized the grandmother as "psychotic." And, during closing arguments, trial counsel told the jurors that the grandmother had "some mental health issues[,]" might be "crazy," and had a lot of "baggage"; characterized her testimony as "not reasonable"; and argued that the grandmother "was an 'are you kidding me[?]' witness" on whom the State had wasted the jurors' "precious time."

Following the Appellant's convictions on aggravated child molestation, child molestation, and cruelty to children, the Appellant filed a motion for new trial, which the court denied. This appeal followed.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict and an appellant no longer enjoys the presumption of innocence. This Court determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*,[11] and does not weigh the evidence or determine witness credibility. Any conflicts or inconsistencies in the evidence are for the jury to resolve. As long as

---

[11] 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

11

there is some competent evidence,[12] even though contradicted, to support each fact necessary to make out the State's case, we must uphold the jury's verdict.[13]

"The standard of *Jackson v. Virginia*[14] is met if the evidence is sufficient for any rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crime charged."[15] With these guiding principles in mind, we turn now to the Appellant's specific claims of error.

1. The Appellant contends that the trial court abused its discretion when it excluded evidence that the victim's grandmother had been diagnosed with paranoia, bi-polar disorder, and/or schizophrenia (collectively, "mental illness").[16] In related

---

[12] In 2011, the Georgia General Assembly repealed the existing Evidence Code in its entirety and replaced it with a new Evidence Code, the provisions of which became effective on January 1, 2013, and apply to any motion, hearing, or trial commenced on or after such date. Ga. L. 2011, p. 99, §§ 1, 101. Because the trial in this case took place in 2011, the former Evidence Code applies.

[13] *Walker v. State*, 329 Ga. App. 369, 370 (765 SE2d 599) (2014) (punctuation and other footnote omitted).

[14] 443 U. S. at 319 (III) (B).

[15] See *Bautista v. State*, 305 Ga. App. 210, 211 (1) (699 SE2d 392) (2010).

[16] We note that there is no evidence in the record that a physician ever diagnosed the grandmother with a severe mental illness or that the grandmother actually suffered from a severe mental illness at the time the victim was being

arguments, the Appellant contends that the victim's mother should have been allowed to offer her lay opinion that, based upon her observations of the grandmother during the time period surrounding the victim's molestation, the mother believed that the grandmother was mentally ill.[17] He also argues that his former girlfriend should have been allowed to testify about specific acts by the grandmother that caused her (the girlfriend) to believe that the grandmother was mentally ill. The Appellant argues that this evidence was wrongly excluded because it was relevant to his defense that the

---

molested. On the contrary, the grandmother testified during cross-examination that the only medications she had been taking at that time were to treat diabetes, high blood pressure, and asthma. See *Davidson v. State*, 232 Ga. App. 250, 252-253 (2) (501 SE2d 510) (1998) (The trial court was authorized to exclude evidence that the victim previously suffered from mental illness as irrelevant in the absence of expert testimony that the victim's condition affected the credibility of his allegations against the defendant.).

[17] See *Miller v. State*, 292 Ga. App. 641, 642 (2) (666 SE2d 35) (2008) ("[L]ay witnesses may relate their opinion as to the existence of any fact so long as it is based upon their own experiences and observations, and so long as the matter referred to is within the scope of the average juror's knowledge.") (punctuation and footnote omitted).
We note that, during cross-examination, trial counsel asked the mother if the grandmother had "any issues[,]" and the mother said no, other than getting upset "if things don't go her way[.]"

grandmother's belief that he was molesting the victim was the product of her mental illness, not reality.[18]

Pretermitting whether the trial court improperly excluded the evidence at issue, however, the Appellant's trial counsel did not proffer the evidence during trial.

> Where the error alleged is that certain evidence has been wrongfully excluded, the rule is well settled that there must have been a proffer or offer of a definite sort so that both the trial court and the appellate court can know whether the evidence really exists. In the absence of such a proffer, the assignment of error is so incomplete as to preclude its consideration by this [C]ourt.[19]

Therefore, the Appellant is unable to show on appeal that the excluded evidence would have been admissible and favorable to his defense, so that his defense was prejudiced by the exclusion thereof.[20]

---

[18] To the extent the Appellant argues in his brief that the evidence was admissible under former OCGA § 24-3-2, he failed to raise this argument during trial, so the court did not have the opportunity to consider it before ruling. Therefore, this argument has not been preserved for our review. See *Holder v. State*, 242 Ga. App. 479, 482 (5) (529 SE2d 907) (2000) ("Our scope of review is limited to the scope of the ruling in the trial court as shown by the trial record and cannot be enlarged or transformed through a process of switching or shifting.") (citation omitted).

[19] *Holder*, 242 Ga. App. at 482 (5) (citation and punctuation omitted).

[20] See *Adams v. State*, 344 Ga. App. 159, 164-165 (2) (809 SE2d 87) (2017) (Pretermitting whether the trial court should have permitted defense counsel to

14

Moreover, the grandmother was neither an eyewitness to the alleged crimes nor an outcry witness to whom the victim had disclosed the molestation, and she did not testify that the Appellant had actually committed the crimes. Instead, the grandmother testified that she had observed the Appellant interacting with the victim over several months and that, based on such observations, she conveyed to the mother her concerns that the Appellant might be molesting the victim. Because the grandmother testified at trial, the jurors were able to assess her memory of the relevant events and determine whether those memories were consistent with the other evidence presented, or whether her testimony was unreasonable and her memories were the product of her "mental health issues" and emotional "baggage," as trial counsel argued to the jury.[21]

present certain testimony, the defendant failed to proffer the testimony to show that it was materially different from that which had already been presented and, thus, failed to show that any harm resulted from the exclusion.).

[21] See *Kirchner v. State*, 322 Ga. App. 275 (744 SE2d 802) (2013) ("It is the function of the jury, not this Court, to determine the credibility of the witnesses, resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence.") (citation omitted); *Bray v. State*, 294 Ga. App. 562, 563 (1) (669 SE2d 509) (2008) ("A jury is authorized to believe or disbelieve all or any part of the testimony of witnesses, and it serves as the arbiter of conflicts in the evidence before it.") (citation and punctuation omitted).

Further, given the victim's testimony and statements during the forensic interview,[22] the Appellant's statements to the victim and her mother after they confronted him with the molestation allegations, and his flight to North Carolina immediately thereafter,[23] we find that the Appellant has failed to demonstrate any harm resulting from the exclusion of evidence about the grandmother's alleged mental illness.[24]

2. The Appellant also contends that his trial counsel provided ineffective assistance when she failed to elicit the mother's testimony about her belief that the grandmother had been diagnosed with a mental illness. He argues that the testimony would not have been inadmissible hearsay,[25] because it would not have been offered

---

[22] See former OCGA § 24-4-8 ("The testimony of a single witness is generally sufficient to establish a fact.").

[23] See *Shaheed v. State*, 245 Ga. App. 754, 755 (1) (538 SE2d 823) (2000) ("Flight is circumstantial evidence of consciousness of guilt; the weight to be given such evidence is for the jury to decide.") (citation and punctuation omitted).

[24] See *Adams*, 344 Ga. App. at 164 (2) ("[T]o prevail on appeal, an appellant must show harm as well as error in the exclusion of evidence.") (citation and punctuation omitted).

[25] See, e.g., *Moody v. State*, 244 Ga. 247, 249 (4) (260 SE2d 11) (1979) ("[E]valuations, opinions, diagnoses, conclusions and statements of third parties not before the court are inadmissible."); see also *Green v. State*, 266 Ga. 237, 239 (2) (466 SE2d 577) (1996) ("[A] witness testifying as to the existence of a fact must testify from his own firsthand knowledge.") (citations and punctuation omitted).

for the truth of the matter asserted. Instead, he contends that the testimony would have explained why the mother did not immediately act when the grandmother expressed her concern that he (the Appellant) was molesting the victim.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different.[26] The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. [The appellate court] accept[s] the trial court's factual findings and credibility determinations unless clearly erroneous, but . . . independently appl[ies] the legal principles to the facts.[27]

"Absent clear error and harm, we will affirm the trial court's finding that [the appellant] did not receive ineffective assistance of counsel."[28]

---

[26] *Strickland v. Washington*, 466 U. S. 668, 690 (III) (A) (104 SCt 2052, 80 LE2d 674) (1984).

[27] *Robinson v. State*, 277 Ga. 75, 75-76 (586 SE2d 313) (2003) (citations and punctuation omitted).

[28] *Glass v. State*, 255 Ga. App. 390, 401 (10) (565 SE2d 500) (2002) (footnote omitted).

In this case, pretermitting whether the mother's testimony would have been relevant and admissible,[29] as discussed in Division 1, supra, the Appellant's appellate counsel failed to call the mother as a witness and proffer the testimony at issue, or tender a legal substitute for such testimony (such as an affidavit), during the motion for new trial hearing.[30]

> In assessing the prejudicial effect of counsel's failure to call a witness (whether that failure resulted from a tactical decision, negligent oversight, or otherwise), a [defendant] is required to make an affirmative showing that specifically demonstrates how counsel's failure would have affected the outcome of his case. The failure of trial counsel to

---

[29] See *Gilmer v. State*, 339 Ga. App. 593, 599 (2) (c) (794 SE2d 653) (2016) ("Because [the defendant] did not call the mother to testify at the new trial hearing, there is no evidence in the record as to what her testimony would have been[.] In the absence of such evidence, [the defendant] failed to make an affirmative showing that, had his trial counsel attempted to cross-examine the mother [at trial] regarding the [issue], it would have been allowed in the discretion of the trial court.") (citations omitted); see also *Leopold v. State*, 324 Ga. App. 550, 555-556 (1) (b) (751 SE2d 184) (2013) (The defendant was unable to show that his counsel provided ineffective assistance by failing to impeach a witness with certain evidence when the defendant failed to establish that the evidence would have been admissible.).

[30] See *Manriquez v. State*, 285 Ga. 880, 881 (2) (684 SE2d 650) (2009) ("When a defendant claims that trial counsel performed deficiently in failing to call a witness for trial, the defendant may not rely on hearsay and speculation, including prior unsworn statements, to prove the prejudice prong of his ineffectiveness claim. Rather, the defendant must introduce either testimony from the uncalled witness or a legally recognized substitute for his testimony, such as an affidavit.") (citations and punctuation omitted).

employ evidence cannot be deemed to be prejudicial in the absence of a showing that such evidence would have been relevant and favorable to the defendant. Because [the Appellant] failed to make any proffer of the . . . testimony [at issue], it is impossible for [the Appellant] to show there is a reasonable probability the results of the proceedings would have been different.[31]

Consequently, the Appellant has failed to show that the mother would have provided the testimony at issue during trial, that her testimony would have been favorable to his defense, and that, if trial counsel had elicited such testimony, there is a reasonable likelihood that the outcome of the trial would have been different.[32] Under such circumstances, we need not evaluate whether trial counsel's performance was deficient for not presenting this evidence, because the Appellant has failed to

---

[31] *Goodwin v. Cruz-Padillo*, 265 Ga. 614, 615 (458 SE2d 623) (1995) (citations and punctuation omitted).

[32] See *Goodwin*, 265 Ga. at 615; see also *McDuffie v. State*, 298 Ga. 112, 116 (2) (779 SE2d 620) (2015) (Because the defendant did not call the witness during the motion for new trial hearing to establish what her trial testimony would have been, and the report that allegedly noted her statement is not in the record on appeal, he failed to demonstrate either deficient performance or resulting prejudice.); *Jones v. State*, 292 Ga. 593, 599-600 (7) (c) (740 SE2d 147) (2013) (Because the defendant failed to make the requisite proffer of the evidence he contends trial counsel should have presented, "his contention that the outcome of the trial would have been different had the witness testified is wholly speculative and cannot sustain a claim of ineffective assistance of counsel.") (citation omitted).

establish the second prong of the *Strickland* test, which is that the alleged error prejudiced his defense.[33]

3. The Appellant contends that his counsel provided ineffective assistance by failing to object and failing to move for a mistrial when the prosecutor allegedly made an improper statement during closing arguments. Specifically, the Appellant argues that, while addressing the testimony of Anique Whitmore, the State's expert witness, the prosecutor told the jury that the expert witness had already decided that the Appellant was guilty of molesting the victim and that, if the expert had not believed that the Appellant had done so, the State would not have put the Appellant on trial. He contends that the prosecutor's statement was improper and prejudicial because it "intimate[d] that the government [had] already decided [his] guilt" and, thus, had invaded the province of the jury as to the ultimate issue to be decided. We disagree.

According to the Appellant's brief and the trial transcript, the prosecutor's actual statement at issue is as follows: Whitmore "testified that if [she] didn't find anything in the interview of the child, [she] would suggest that the case not go

---

[33] See *Hammond v. State*, 264 Ga. 879, 880 (1) (452 SE2d 745) (1995) ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.") (citation and punctuation omitted).

20

forward." The Appellant's characterization of this statement, however, constitutes a significant misrepresentation of the actual statement, particularly when it is read in context,[34] as follows:

> You heard [Whitmore] testify on the stand [that] she's done thousand[s] of interviews. She's counseled hundreds of kids. She's experienced in this. She knows what she is talking about. She's testified that if [she] didn't find anything in the interview of the child, [she] would suggest that the case not go forward. She evaluates the children and she talked to you about the concepts that fit.

Thus, the prosecutor was referring to Whitmore's testimony about her evaluations of crimes involving child victims generally, not this case specifically. In fact, Whitmore never offered an opinion in this case as to whether the victim's behavior prior to her disclosure, or her responses during the forensic interview, were consistent with child sexual abuse accommodation syndrome, nor did she offer an opinion as to whether the Appellant was, in fact, guilty of the crimes charged. And neither did the

---

[34] See *Powell v. State*, 291 Ga. 743, 746-747 (2) (b) (733 SE2d 294) (2012) (The Court held that, even though the challenged remarks were "highly improper, it [was] important to view those remarks not in isolation, but in their proper context.") (citations omitted); *Scott v. State*, 290 Ga. 883, 885 (2) (725 SE2d 305) (2012) ("A closing argument is to be judged in the context in which it is made.") (citation omitted).

prosecutor, contrary to the Appellant's assertions on appeal. Thus, the single statement by the prosecutor is far less egregious than those addressed in the cases upon which he relies for his argument that trial counsel's failure to object constituted ineffective assistance.[35]

Further, shortly after the prosecutor made the statement at issue, the trial court instructed the jury that the statements of the attorneys during closing arguments were not evidence and that it was the jury's role to determine whether the defendant was guilty beyond a reasonable doubt or not guilty of the crimes as charged in the indictment.[36]

---

[35] See, e.g., *Powell*, 291 Ga. at 745 (2) (During closing arguments, the prosecutor told the jury, "'If we think it's a bad arrest, if we think there's not enough evidence, what happens to that case? It goes. We don't bring it to indictment if we think the person is innocent, if there is not enough evidence.'" Although the Court found that the remarks were improper, it concluded that the defendant had failed to demonstrate that he was prejudiced by trial counsel's failure to object and, thus, it affirmed the denial of his ineffective assistance claim.).

[36] The trial court also instructed the jury on the presumption of innocence, that the State had the burden of proving every element of the crimes as charged in the indictment beyond a reasonable doubt, that the jurors were responsible for judging the credibility of witnesses and resolving conflicts in the evidence, and that the testimony of a single witness is generally sufficient to prove a fact. See *Holmes v. State*, 273 Ga. 644, 648 (5) (c) (543 SE2d 688) (2001) ("Qualified jurors under oath are presumed to follow the instructions of the trial court.") (citations and punctuation omitted).

Moreover, even assuming, without deciding, that the single statement of the prosecutor was improper under these circumstances, the Appellant has failed to demonstrate that he received ineffective assistance of counsel.[37]

In its order denying the Appellant's motion for new trial, the trial court found that, based on trial counsel's testimony during the motion hearing, counsel had made a strategic decision not to object during the prosecutor's closing argument. "As a general rule, matters of reasonable tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel."[38]

The Appellant complains, however, that trial counsel's testimony during the hearing does not support the court's finding that counsel's failure to object was the result of a strategic decision. "Although both the performance and prejudice

---

[37] See *Glass*, 255 Ga. App. at 401 (10) ("Absent clear error and harm, we will affirm the trial court's finding that [the defendant] did not receive ineffective assistance of counsel.") (footnote omitted); see also *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015) ("Failure to satisfy either prong of the *Strickland* test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to examine the other prong.") (citation and punctuation omitted).

[38] *Grier v. State*, 273 Ga. 363, 365 (4) (541 SE2d 369) (2001) (citation and punctuation omitted). See *McNair v. State*, 296 Ga. 181, 184 (2) (b) (766 SE2d 45) (2014) ("Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them.") (citation and punctuation omitted).

23

components of an ineffectiveness inquiry involve mixed questions of law and fact, a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous."[39] Here, the motion for new trial hearing transcript shows that trial counsel initially offered no reason to explain why she did not object to the prosecutor's statement. She subsequently testified, however, that an attorney who objects too often might alienate the jury, that she generally did not object during closing arguments because she had to choose which "battles to fight[,]" and that it was "very possible" that she intentionally did not object in this case because she did not want to highlight the argument to the jury. Because there was evidence to support the trial court's finding that counsel's failure to object was the result of a strategic decision, this Court must defer to the trial court's ruling and accept such finding.[40]

---

[39] *Smith*, 296 Ga. at 733 (2) (citation omitted). See *Gilmer*, 339 Ga. App. at 594 (2) ("In reviewing a claim of ineffective assistance, we give deference to the trial court's factual findings and credibility determinations unless clearly erroneous, but we review a trial court's legal conclusions de novo.") (citation and punctuation omitted).

[40] See *Smith*, 296 Ga. at 733 (2); *Gilmer*, 339 Ga. App. at 594 (2); *Glass*, 255 Ga. App. at 403-404 (10) (g).

24

More importantly, when considering an ineffective assistance of counsel claim, "[t]he proper assessment is an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."[41]

> Hindsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his own performance with the benefit of hindsight has no significance for an ineffective assistance of counsel claim. Moreover, [this Court is] not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct. If a reasonable lawyer might have done what the actual lawyer did — whether for the same reasons given by the actual lawyer or different reasons entirely — the actual lawyer cannot be said to have performed in an objectively unreasonable way.[42]

In other words, to overcome the strong presumption that counsel's representation fell within the wide range of reasonable professional assistance, the Appellant had to show that no reasonable counsel would have failed to object to the prosecutor's statement.[43]

---

[41] *Hartsfield v. State*, 294 Ga. 883, 888 (3) (b) (757 SE2d 90) (2014) (citation and punctuation omitted).

[42] *Gilmer*, 339 Ga. App. at 595-596 (2) (a) (citations and punctuation omitted).

[43] See *Jones v. State*, 292 Ga. 593, 600-601 (7) (d) (740 SE2d 147) (2013).

In this case, a reasonable lawyer might have concluded that objecting to the statement during closing arguments would have simply emphasized the statement and magnified any harmful implications from it, as well as given the prosecutor an opportunity to present a similar, but non-objectionable, argument.[44] In addition, in trial counsel's closing argument in this case, counsel recounted Whitmore's testimony about the "contextual details" that might indicate that a child had fabricated the allegation or been coached, and counsel emphasized to the jury the various inconsistencies in the victim's description of the "contextual details" surrounding the alleged molestation in order to attack the victim's credibility. Counsel also argued that the victim in this case did not exhibit many of the symptoms of child sexual abuse accommodation syndrome that Whitmore had explained during her testimony. Because this argument relied on Whitmore's expertise, it would have been reasonable for trial counsel to have been reluctant to object to the prosecutor's statement out of a legitimate concern that an objection would be perceived by the jury as a challenge to Whitmore's expertise and, thus, undermine an important aspect of counsel's own

_____

[44] See *Jones*, 292 Ga. at 602 (7) (d) (Even if the testimony at issue might have been harmful to the defense, there were several reasons why a reasonable lawyer might not have objected, including the possibility that objecting "could signal to the jury that the defense was worried about such testimony, thereby emphasizing the testimony and magnifying any harmful implications of it.") (citation omitted).

26

closing argument.[45] Under these circumstances, we conclude that the Appellant has failed to show that his trial counsel's tactics and strategies were unreasonable and involved decisions that no competent attorney would have made.[46]

For all of these reasons, we conclude that trial counsel's failure to object to the statement at issue did not constitute deficient performance and that the Appellant has failed to carry his burden of demonstrating that he was denied the effective assistance of counsel.

4. The Appellant claims that the trial court erred in issuing a void sentence, arguing that the court failed to impose a probated sentence of at least one year in addition to the mandatory sentence (also known as a "split sentence"), as required by former OCGA § 17-10-6.2 (b). We agree in part.

---

[45] See *Gilmer*, 339 Ga. App. at 596-597 (2) (Trial counsel's strategy was to "co-opt" the testimony of the State's expert witness in order to challenge the way that the forensic interviews of the children had been conducted. "Under these circumstances, it would not have been unreasonable for counsel to decline to object to the [expert witness's] bolstering testimony, inasmuch as it would draw attention to an error [the expert witness] made in her testimony, which would be inconsistent with counsel's attempt to show that [the witness] was a qualified expert who had serious concerns with the forensic interviews.") (citations omitted).

[46] See *McNair*, 296 Ga. at 184 (2) (b).

The record shows that the trial court sentenced the Appellant to serve life in prison for the aggravated child molestation conviction; a consecutive 20-year sentence for child molestation; and a consecutive 20-year probated sentence for the cruelty to children conviction. The version of OCGA § 17-10-6.2 (b)[47] that was in effect in 2010, when the crimes were committed,[48] provided that, subject to certain exceptions that are not applicable here,

> any person convicted of a sexual offense shall be sentenced to a split sentence which shall include the minimum term of imprisonment specified in the Code section applicable to the offense. No portion of the mandatory minimum sentence imposed shall be suspended, stayed, probated, deferred, or withheld by the sentencing court and *such sentence shall include, in addition to the mandatory imprisonment, an additional probated sentence of at least one year.*[49]

---

[47] See Ga. L. 2006, p. 379, § 21. The Georgia Legislature amended OCGA § 17-10-6.2 (b) in 2013 and 2017. See Ga. L. 2013, p. 222, § 21; Ga. L. 2017, p. 489, § 5. See Division 4 (c), infra, regarding the 2017 amendment.

[48] See *Fleming v. State*, 271 Ga. 587, 590 (523 SE2d 315) (1999) ("[I]t has long been the law in this state that, in general, a crime is to be construed and punished according to the provisions of the law existing at the time of its commission.") (citations omitted); *Hicks v. State*, 228 Ga. App. 235, 237 (1) (b) (494 SE2d 342) (1997) ("The law as it exists at the time of the offense determines both the penalty that may be imposed and the conduct that is considered to be a crime.") (citations and footnote omitted).

[49] (Emphasis supplied.)

(a) As an initial matter, former OCGA § 17-10-6.2 (a) provided that the term "sexual offense," as used in that statute, included the crime of child molestation,[50] but did not include the crimes of aggravated child molestation or cruelty to children. Thus, the trial court did not err in failing to apply the split sentence provision in former OCGA § 17-10-6.2 (b) to the sentences on the Appellant's convictions for aggravated child molestation and cruelty to children.[51]

(b) The 20-year sentence imposed by the court for the Appellant's child molestation conviction, however, did not include at least one year of probation and, thus, was void under former OCGA § 17-10-6.2 (b).[52] As a result, that sentence is vacated, and this case is remanded to the trial court for resentencing on that conviction.[53]

---

[50] See OCGA § 17-10-6.2 (a) (5).

[51] See *Wilder v. State*, 343 Ga. App. 110, 112 (806 SE2d 200) (2017) ("A sentence that falls within the prescribed statutory limits . . . is legally authorized and is not subject to review by this Court.") (citations and punctuation omitted).

[52] See *Daniels v. State*, 344 Ga. App. 190, 192 (809 SE2d 473) (2018); see also *State v. Riggs*, 301 Ga. 63, 64-67 (1) (799 SE2d 770) (2017) (holding that the split-sentence requirement of OCGA § 17-10-6.2 (b) applied to each sexual offense conviction, and not to the aggregate sentence for multiple sexual offense convictions).

[53] See *Underwood v. State*, 344 Ga. App. 403, 409 (3) (810 SE2d 315) (2018); *Daniels*, 344 Ga. App. at 193.

(c) The State argued in the court below, however, that the current version of the statute[54] applied retroactively and, thus, authorized the Appellant's sentence because it included a 20-year probated sentence for the cruelty to children conviction. This argument lacks merit for two reasons.

First, in *Hardin v. State*,[55] this Court specifically rejected the argument that OCGA § 17-10-6.2 (b) applied retroactively. And, second, even if the current statute could be applied retroactively, the consecutive 20-year probated sentence for the Appellant's cruelty to children conviction is not a "consecutive sentence[ ] for [a] sexual offense[ ]" under the current version of OCGA § 17-10-6.2 (b), because the term "sexual offense" in OCGA § 17-10-6.2 (a) does not include the crime of cruelty

---

[54] The current version of OCGA § 17-10-6.2 (b), as amended in 2017, includes the following highlighted language:
> No portion of the mandatory minimum sentence imposed shall be suspended, stayed, probated, deferred, or withheld by the court. Any such sentence shall include, in addition to the mandatory term of imprisonment, an additional probated sentence of at least one year; *provided, however, that when a court imposes consecutive sentences for sexual offenses, the requirement that the court impose a probated sentence of at least one year shall only apply to the final consecutive sentence imposed*.

(Emphasis supplied.) See Ga. L. 2017, p. 489, § 5.

[55] 344 Ga. App. 378, 387-389 (2) (810 SE2d 602) (2018).

30

to children.[56] Therefore, even if the current version of the statute could be applied in this case, the sentence on the child molestation conviction would still be invalid.

*Judgment affirmed, sentence vacated in part, and case remanded for resentencing. Barnes, P. J., and McMillian, J., concur.*

---

[56] See Division 4 (a), supra.